On Rehearing.
PROVOSTY, J.
This suit and the companion suit of Hart v. Same Defendant (No. 22792) 82 South. 79,i are petitory actions to recover from the defendant city the strip of ground 53% feet occupied by the prolongation of St. Hypolite street, going north, across the square that lies between Slocum alley and Boyd avenue — north of Slocum alley and south of Boyd avenue — the latter streets running east and west, paralleling each other. This strip takes up all of lots 5 and 16 except the easternmost 10% feet. Lot 5 fronts on Slocum alley; lot 16, on Boyd avenue. The present suit involves lot 5; the other suit, lot 16.
[1] The city claims title only by the prescription of 30 years. Plaintiff traces title to the original owners by a tax sale made in 1872. This tax title is unquestionably good —by the prescription of three years, if not otherwise; for, as against the tax debtors or former owners, the plaintiff and his authors *165 in title under the tax sale have had during all this time possession of part, at any rate, of the lot covered by the tax title, if not of the whole, and, as against these former owners, this possession of part with title to the whole is equivalent in law to possession of the whole.
The official map of the city has all along shown St. Hypolite street as stopping at Slocum alley. We doubt very much whether this of itself would not be fatal to the prescription, as importing a constant acknowledgment of the precariousness of the city’s possession.
The present suit was filed in March, 1917. Hence the 30-year prescriptive period would run back to March, 1887.
Hart, the plaintiff in the companion suit, testified that in 1892, in anticipation of purchasing his lot at a tax sale which was then being advertised, he went to view the lot, and found that it was inclosed by an old fence and had been cultivated as a garden. The lot was worth little, and witness paid no attention to it for a number of years. “Several years ago,” witness has forgotten in what year, witness tried to put up a fence along the Boyd avenue front of lot 16, and sent a carpenter to do the work and the city authorities caused the man to be arrested. Witness employed Mr. Kernan as his attorney for getting possession from the city, but Mr. Kernan never did anything. Witness does not know why. In 1916, before the surface was worked into a street, the city was in negotiation with witness for the purchase of the lot.
“Q. This taking possession of this lot, was that done with yonr consent or against your protest? A. Against my protest. Q. Why didn’t you prevent them from taking active possession or put them off after they had been on there? A. They took possession without my knowing that they had done so, and I got a notification from the city that negotiations were off for the purchase of the lot one day, and I suspected at once that they were doing something up there, and I found that they had begun work the day before, and were in actual possession. Q. Doing what? A. They were digging the surface of the lot away. Immediately I took the notice to you, and asked you to prevent them from going further. Q. Why didn’t you put up a fence in front to stop them? A. I tried that once, and they put my man in jail.”
The witness Hacket, 60 years old, lived on St. Mary street, corner Slocum alley, one block from St. Hypolite, from 1868 to 1'890. Ran a dray during that time, and remembers well that St. Hypolite street north of Slocum alley was then fenced up; that to get to Boyd avenue he had to go either by St. Mary street or around by College street. Witness remembers the date well, because he was married on the 17th of December, 1890.
The witness Seaman moved to Baton Rouge in 1889, and went to live on St. Hypo-lite street in the middle of the block between North street and Slocum alley, and lived there until 1891, the year of the great cyclone. He is positive that St. Hypolite street north of Slocum alley was then closed by a fence, and that there was a vegetable garden on lot 16.
On the side of defendant there is the following:
M. J. Williams lived from 1872 to 1892 at the corner of North and St. Hypolite streets. North is the street immediately south of Slocum alley. In 1892, and for several years prior to that, St. Hypolite street was open between the alley and Boyd avenue. At one time Mr. Favrot (then owner of lot 5) put up a fence across the street along the upper line of Slocum alley. “Q. In about what year? A. I couldn’t tell you that; along in the 80’s I think.” It remained, there “maybe a couple of months.” The city council, of which witness was a member, had it removed. “Q. Do you know whether it has ever been put up since then? A. No. Q. You mean no, it was not? A. I don’t think *167 it was ever put up. Q. You have been living there ever since? A. Yes. Q. What is your age? A. 77.” Witness admits, on cross-examination, that his memory is uncertain as to dates; but he is positive that he went to live at the corner of North and St.. Hypolite streets in 1871.
L. iLatil, in 1885, was living at corner of North and Union streets, two blocks from place in question. St. Hypolite was then open to Boyd avenue, and has been open since before the war; that it could not have been closed without his knowing it.
(N. B. The statement of the street having been open since before the war is in conflict with that of defendant’s witness Phillips and that of plaintiff’s witness Seese, the latter of whom says that in 1861 or 1862 he lived on St. Hypolite street, and that at that time lot 16 was occupied by a family by the name of Provost, who had a dwelling and garden upon it; that he was in the house many a time.)
John Schroeder is positive that St. Hypo-lite between Slocum alley and Boyd avenue has been open continuously since 1903, but is not positive that it was not fenced up prior to 1903, though he remembers it from 1875, and does not remember of its having ever been closed up since that time.
Frank Phillips has known the place since 1885, and always as an open street. Lived within one block of the place. It was inclosed up to 1862, when the Federáis bürned all the houses in that neighborhood except the Jesuits’ College.
A. F. Sanchez has known St. Hypolite street between Slocum alley and Boyd avenue since “the latter part of the 70’s,” and has always known it to be open. Was never closed, so far as he knows. In the 70’s and 80’s used to ride around a good deal peddling milk and vegetables.
Ben F. Waddill is positive that the street has been open to Boyd avenue for more than 30 years. Used to play when 10 years old on corner of St. Hypolite and North streets, which was open and served as a playground, and used to pass through to Boyd avenue to go fishing.
T. H. W.alsh testified that when, as administrator of public improvements, he was working St. Hypolite street in 1898 with a gang of men, the plaintiff, Hart, who was then mayor, came out to look at the street work that was being done, as his wont was, and on being told by witness, “I am continuing this to Boyd avenue,” said to witness; “No; by the way, I am glad I am here in time. Don’t disturb that between Slocum alley and Boyd avenue; that is my property.” The witness says of the condition of the locality at that time: “It was a flat piece of ground, and people used to go through there. What I mean by flat piece of ground is that there was a pathway worn for vehicles to go, and no sign of an old ditch, and no sign of being worked as a street.” The witness says that he was administrator of public improvements from 1890 to 1896, “possibly six years before that,” and that he never worked the place in question as a street; that as long as he has known the place, however, it has always been open as a street.
Geo. W. Garig: St. Hypolite street extends from Convention street, which is one street south of North street, to Boyd avenue. Has always known it to be open to Boyd avenue, and his recollection goes, he guesses, twenty-five years or more back. Ten years ago was administrator of improvements, and worked the street. “Recently we have put in curbing, sewer, and water mains.” There are brick sidewalks on the street, but does not know when they were laid.
There can be no doubt at all that all these witnesses have testified candidly according to their impressions. Numerically the preponderance is with the defendant, but, in substance, it is with plaintiff. For it is en *169 tirely possible that after having known this street, or open place, as an open place for so many years, defendant’s witnesses may entertain the impression that they have always known it to be in that condition, and yet be mistaken in that impression; whereas the same explanation could not serve to acquit plaintiff’s witnesses of intentional falsification if their statements were not true.
[2] If plaintiff’s evidence were eliminated, however, and the fact were accepted as proven that for more than 30 years before the bringing of this suit this place had remained open and the public had passed over it freely, both on foot and in carriages and wagons, would this suffice for establishing the possession of 30 years required for prescription? We think not. The possession required for prescription must be unequivocal (C. C. art. 3500); and a possession manifested only by passing over unfenced land is equivocal in the highest degree; so much so that it is no longer allowed to serve as a basis for the acquisition of a servitude of passage. C. C. arts. 766, 727; Duranton, vol. 21, No. 237. In Lawson v. Shreveport, 111 La. 73, 83, 35 South. 390, 394, this court said:
“It has more than once been held by this court that, in the absence of proof of intention on the part of the owner to dedicate his property to public use, the mere use of the passage by the public, for however long a time, cannot supply a title or serve as a basis of prescription. Torres v. Falgoust, 37 La. Ann. 500; McCearley v. Lemennier, 40 La. Ann. 253, 3 South. 649; De Grilleau v. Frawley, 48 La. Ann. 184, 19 South. 151; Railroad Co. v. Mayor, 48 La. Ann. 1115, 20 South. 664.”
Whether the city could in any event acquire more than a servitude of passage, quaere? And a servitude of passage cannot be acquired by prescription.
The evidence shows that the 10% feet, constituting the part of lot 16 unappropriated for the street, was fenced in; and that this 10% feet space was first leased, and then, later on, sold by the owner, Mr. Hart, plaintiff in the other suit. In what year this separation fence was erected the evidence does not show, but it was well within the 30-year period. This separating by a fence that part of the lot not occupied by the street from the part occupied by the street was a sign of possession by the public, and is the first unequivocal sign of actual possession shown by the evidence. The other acts of possession; by working the street, putting in sidewalks drains, etc., came much later.
Our conclusion must be that the plea or prescription of 30 years is not sustained.
All idea of acquiescence on the part of the owners of these lots is positively and clearly excluded by the testimony which shows that when they tried to fence in this open space the city made use of the big stick of the criminal law against them; and that eventually the street work, in the way of graveling, laying of mains, etc., was done over their protest. And yet the defendant sets up as a second, or alternative, defense that the plaintiff acquiesced in the property being taken and improved for street purposes, and is therefore estopped from revendieating the land, and is relegated to an action in compensation for its value.
[3] That defense cannot be availed of for several reasons: First, it was not pleaded below, and still less tried, and it is a special defense, which would have had to be specially pleaded, and evidence taken upon it, if intended to be relied on'. Secondly, even if such a defense could be pleaded in the Supreme Court for the first time, especially when the case is being heard on rehearing, as the defendant city has done, the facts necessary for the disposition of it in the present case are not in the record. Thirdly, if it were to be tried on the facts in the record, it would have to be rejected, since these facts show the very opposite of acquiescence. They show that the city was fully and thoroughly advised that the owners of record *171 were claiming ownership and were opposing a taking, and that therefore, when the city took possession of this strip of land and incurred expenses upon it, she did so with her eyes wide open. Fourthly and finally, in view of the change made in our Constitution by which the eminent domain power is allowed no longer to be exercised by first taking the property and afterwards paying or compensating for it, but is allowed to be exercised only by first paying (i. e., paying in legal tender money of the. United States), and taking afterwards, it is doubtful whether this court is in a position to follow the precedents created under previous and differently worded Constitutions, according to which the taking was allowed to precede payment, on the theory of an estoppel based upon equity; or that this court will follow those precedents unless under stress of' dire necessity, as in the case of railroads or industrial canals — public carriers, whose stoppage would block the wheels of commerce.
[4] Moreover, it would seem that, in invoking equity for divesting the plaintiff of his property, the defendant city should at the same time offer to do equity by expressing her willingness to pay the value of the property, and asking that the case be remanded to allow her to deposit in court the amount of the value of the property in legal tender money of the United States, subject to plaintiff’s acceptance in the event judgment should go in favor of plaintiff on the question of title; she has not done this.
[5] Plaintiff claims rental value at the rate of $15 a month from August 5,1916, and $850 for injury done to the lot by excavation, and also attorney’s fees. As the lot will in all probability have to be expropriated by the city, and as the evidence touching this excavation is very meager, we will nonsuit plaintiff on that claim. Rental value we will allow from the date of the filing of the suit, March 1, 1917, at the rate of $10 a month, which is the lowest fixed in the record. Attorney’s fees cannot be allowed in an ordinary suit.
The judgment appealed from is set aside; and it is now ordered, adjudged, and decreed that plaintiff, Henry E. Reymond, have judgment against defendant the City of Baton Rouge, recognizing him to be the owner of the following described property, to wit:
A certain fractional lot or parcel of ground, situated in that part of the city of Baton Rouge known as Grandpre or Spanish Town, and designated on the official map of the city of Baton Rouge made by Waller and Swart as lot No. 5 of square No. 42, Spanish Town, said fractional lot having a front of 54 feet on Boyd avenue or Spanish Town road, by a depth between parallel lines of 117% feet, being all of said lot 5, less 10 feet sold by the late O. H. Eavrot to J. B. Taylor as per act of record in book 14, folio 442, of the conveyances of this parish; being the same property acquired by petitioner from the Eavrot Realty Company on August 21, 1916, by act of record in book 61, folio 333, of the conveyances of this parish.
And it is further ordered, adjudged, and decreed that a writ of possession issue putting the plaintiff in possession of said property.
And it is further ordered adjudged, and decreed that the plaintiff, Henry E. Reymond, have judgment against the defendant the city of Baton Rouge, condemning the said defendant to pay him rental value of the said property at the rate of $10 a month from the 1st day of March, 1917, until possession of said property shall have been delivered to said plaintiff.
And it is further ordered, adjudged, and decreed that the demand of the said plaintiff for attorney’s fees be dismissed, and that the other demands of the said plaintiff for damages be dismissed as in case of nonsuit; and that the defendant city pay all costs.
O’NIELL, J., dissents, adhering to the opinion handed down originally.